## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE GOOGLE ACCOUNT jbchomeimprovement18@gmail.com STORED AT PREMISES CONTROLLED BY GOOGLE LLC | Case No. 2:23-mj-00376-JCN<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Kevin McCusker, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the FBI, and I have been since February 2004. Since August 2020, I have been assigned to the Boston Field Office's Portland, Maine, Resident Agency (Portland RA), where I conduct investigations primarily involving complex financial crimes and related violations of federal law, including wire fraud, bank fraud, and money laundering.  Since being assigned to the Portland RA, I also conduct and participate in investigations involving violent crimes, including bank robberies, threatening communications, and crimes against children.  Prior to being assigned to the Portland, Maine, Resident Agency, I was assigned for nine years to an Economic Crimes Squad in the FBI's Boston Field Office, conducting complex financial crime investigations. Over the course of my career as a federal law enforcement officer, I have utilized various investigative tools and techniques, including the use of search warrants to locate evidence that is stored electronically by an electronic communications service and/or remote computing service provider, like Google LLC.

2.      The FBI has jurisdiction to investigate offenses arising under 18 U.S.C. § 2113, that involve bank robbery.

3.      I make this affidavit in support of an application for a search warrant for information associated with a certain account that is stored at premises owned, maintained, controlled, or operated by Google LLC ("Google"), an electronic communications service and/or remote computing service provider headquartered at 1600 Amphitheater Parkway, Mountain View, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the Government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers, other agents, and witnesses.  This affidavit is intended to provide the facts necessary for a determination of probable cause for the requested search warrant.

5.      Based on the facts set forth in this affidavit, there is probable cause to believe that a violation of 18 U.S.C. § 2113 (bank robbery and theft) has been committed by Joshua Brougham (born xx/xx/1985).  There is also probable cause to search the information described in Attachment A for evidence of these crimes as further described in Attachment B.

**PROBABLE CAUSE**

6.      On October 3, 2022, at approximately 10:41 a.m., Brunswick Police Department ("BPD"), Brunswick, Maine, received a report of a bank robbery occurring

at M&T Bank at 112 Maine Street in Brunswick, Maine.  Officers and detectives of BPD responded to the bank and conducted initial investigation.  The robbery suspect was described by bank employees as being a white male wearing black clothing, a hooded sweatshirt, a dark-rimmed hat, sunglasses, black gloves, dark jean pants, and a red patterned cloth over his mouth and nose, appearing to have Spiderman insignia thereon.  The bank surveillance footage shows that the suspect was wearing a dark-colored jacket with a hood over another dark hooded garment.  The outer jacket bears what appears to be a brand emblem above the left pocket of the jacket.  The bank teller reported that the suspect had a thin build and was around 6 feet tall because she saw that he came up to the 6-foot mark on the door when he left.  Still photographs from the M&T Bank surveillance footage depicting the robber are incorporated herein:

 

**Photographs of suspect from M&T robbery on October 3, 2022**

7.     The bank teller reported that the suspect approached the counter and presented the bank teller with a nylon shopping bag and demanded money, telling her not to put any dye-packs in the bag.  The bank teller said that after she provided some

money to him, the suspect said to the effect of "no, all of it. I got people outside waiting for me," then put his hand in his pocket like he had a gun. The bank teller said she took the bag back and put more money in it and pushed it towards the suspect. She said that after obtaining the money, the suspect left M&T Bank on foot. A total of $3,687 was stolen from M&T Bank.

8.      Photographs of the suspect were posted on social media.

9.      Early in the investigation, several individuals provided tips to law enforcement about who they believed the suspect might be, which were investigated by BPD. On October 3, 2022, detectives with BPD investigated a tip that the robbery suspect looked like an individual from Bowdoin, Maine. A BPD detective contacted the individual's employer and verified that he was at work on October 3, 2022, at the time of the robbery.

10.     On October 4, 2022, a BPD Detective investigated a tip that the suspect might be another individual who reportedly walked with a limp. That same day, the BPD investigated another tip that the suspect might be yet a third individual. BPD Detectives spoke with that individual's employer, who confirmed he had been working at the time of the robbery.

11.     The FBI and BPD continue to investigate this robbery at M&T Bank.

12.     On October 15, 2022, at approximately 11:33 a.m., several Augusta Police Department ("APD") officers were dispatched to Camden National Bank (CNB) at 21 Armory Street in Augusta, Maine, for a report of an armed bank robbery.

13.     The bank teller at CNB reported that a white male wearing a brimmed fishing hat, a blue surgical mask, and dark jacket entered the bank holding a newspaper in his hand. The suspect placed the newspaper on the bank counter, displayed a

4

handgun and pointed it at the teller, and demanded money from the drawer. The teller reported that she placed money on the newspaper and the suspect demanded that the teller give him of the rest of the money. The teller then gave the suspect additional cash. The suspect then folded the newspaper and fled on foot. As will be described in more detail below, Joshua Brougham ("Brougham"), was ultimately identified as the perpetrator and charged with this bank robbery.

14.     Video surveillance from the CNB robbery showed Brougham enter CNB at about 11:18 a.m., wait in the lobby with a newspaper in his hands, and approach the teller station. Brougham interacted with the teller for about 1 minute, placed the newspaper down on the counter, used his right hand to remove a silver handgun from his pocket, and pointed the handgun in the direction of the teller. After demanding and obtaining money from the bank teller, Brougham quickly exited the bank on foot and can be seen on surveillance heading in the direction of Concentra Urgent Care on Capitol Street. Video surveillance showed that Brougham was last seen jogging in the area of the parking lot located to the south of Coldwell Banker Rizzo Mattson Realtors, a business located in the same building as Concentra. Video surveillance footage of another nearby business at the relevant time depicted a gold-colored GMC Yukon leaving the area a short time later. The GMC Yukon had several distinct characteristics and law enforcement obtained a list of similar GMC Yukons that were registered in the surrounding area.

15.     Law enforcement learned that a 2002 gold GMC Yukon (ME plate 5113ZC) was registered to Abigail Cameron ("Cameron"), who was listed in a law enforcement database as being in a relationship with Brougham and last known to be residing with him at an address in Gardiner. Law enforcement reviewed known photographs of

Brougham and observed that Brougham matched the description of the suspect from the CNB robbery, including similar body type, eyes/eyelids, and ears. From reviewing known photographs and information from the Bureau of Motor Vehicles, it is apparent that Brougham is a white male who is approximately 6'2" tall with a thin build.

16.    On October 19, 2022, a patrol officer observed a GMC Yukon that matched the description of the GMC Yukon involved in the CNB bank robbery traveling in Augusta. The vehicle, bearing Maine license plate 5113ZC, pulled into a gas station. Brougham was identified as the operator of the vehicle and was detained. He was then transported to APD to be interviewed by APD detectives.

17.    Prior to being interviewed, while alone in an APD interview room, Brougham attempted to use illicit drugs and a pipe that had been secreted on his person. When APD personnel did not allow him to use the drugs, Brougham appeared upset that he wasn't able to smoke.

18.    During his interview on October 19, after having been provided Miranda warnings, Brougham confessed to committing the robbery of CNB on October 15, 2022. Brougham told APD detectives that he robbed the bank because he had no money, he was about to run out of gas, he lost his apartment in Gardiner about a week and a half ago, and that he, Cameron (his girlfriend), and his children were living with his uncle in Manchester, Maine. When asked what he was thinking about during the robbery, Brougham told the interviewing detectives: "I didn't think nothing. I was like, give me the (expletive) money so I can go get high." Brougham described circumstances of the robbery that were corroborative to the CNB robbery as described previously in this affidavit. During portions of the interview, Brougham spoke about his addiction to opiates and cocaine base and his desire to beat his addiction. After the robbery,

Brougham said he bought drugs, paid off a drug debt, and later went home. Brougham said he threw away the clothes he wore during the robbery in a dumpster in Augusta. Brougham was ultimately charged by APD with the CNB robbery.

19.    On October 20,2022, APD detectives executed a search warrant on the GMC Yukon that Brougham had been driving when he was arrested on October 19. During that search, detectives located a dark-colored Carhartt jacket inside the vehicle. Within the interior pocket of the jacket APD found a handgun magazine loaded with seven .380 caliber bullets. APD detectives also found a .380 caliber handgun wedged between the back seat of the vehicle, among other things.

20.    During an interview with APD detectives on October 20, 2022, Cameron said that she has been trying to get Brougham help with his drug addiction for months. When asked by APD whether Brougham has a black jacket that he typically wears, Cameron said that Brougham likes his Carhartt coat/jacket, which he normally wears. Cameron also said Brougham has a "bunch of hoodies," mostly labeled with roofing businesses where he worked.

21.    From my observation and research, the outer jacket worn by the M&T robber has similarities to the Carhartt jacket found in the vehicle driven by Brougham. Clearly, both jackets are dark in color and are similarly designed. On retailer websites, I have observed a similar Carhartt brand dark jacket that has a hood, interior pockets, and bears the Carhartt emblem above the left pocket of the jacket.

22.    The suspect involved in the bank robbery at M&T Bank on October 3,

2022, has similar physical characteristics to Brougham, who is under indictment for the bank robbery at CNB on October 15, 2022. Like Brougham, the M&T bank robber was a white male with thin build and approximately six feet tall. I have included photographs of the CNB robbery suspect and social media photographs of Brougham below for comparison.

 

**Photographs from CNB robbery on October 15, 2022**

 

**BMV photo of Brougham**     **APD Booking photo of Brougham from October 15, 2022**

8

23.     Through researching known photographs of Brougham displayed upon a Facebook page with the display name Josh Brougham and having vanity name josh.brougham.35, another FBI employee located the below photograph posted by Brougham to his Facebook page and a photograph of Brougham posted to Cameron's Facebook page.  In the photograph, Brougham is wearing a black garment with a zipper that appears similar to the zipper on the hooded garment worn by the M&T Bank robber.  Records produced by Facebook in response to a subpoena identified a registered email address for the Facebook account with vanity name josh.brougham.35 as jbrougham85@yahoo.com and indicated that in February 2019, telephone number (207) 213-5624 was associated with this account.





**Photo from Brougham's Facebook page**          **Photo from Cameron's Facebook page**

24.     When Brougham was arrested by the Augusta Police Department on October 19, 2022, he reported that his phone number was (207) 213-5624.  Using an

FBI investigative tool, the FBI determined that the primary service provider for that phone number was Verizon Wireless. In response to a subpoena, Verizon Wireless provided toll record information for the period of time including both bank robberies, while indicating that subscriber information was maintained by Tracfone, a company serving as a Verizon reseller.

25.    Records provided by Tracfone in response to a subpoena concerning (207) 213-5624 (the "subject phone number") revealed that the subscriber name for the telephone number during both bank robberies was Abigail Cameron of Whitefield, Maine. The same Tracfone records identified an Account ID of jbrougham85@yahoo.com.

26.    Your affiant, being familiar with the investigation of the CNB robbery, is aware that Cameron was Brougham's girlfriend around the time of both robberies.

27.    Verizon records showed the subject phone number was in use on or around October 3, 2022, the date of the bank robbery at M&T Bank, as follows:

> a.  Several calls were conducted the evening of October 2, 2022 between the subject phone number and a number associated with Cameron.
>
> b.  Also over the night between October 2 and 3, 2022, the subject phone number received two calls from (207)462-7415, a telephone number associated with Casey Brougham[1].

---

[1] Being familiar with the investigation of the CNB robbery, your affiant is aware that during an interview of Brougham by Augusta Police, Brougham informed that Casey Brougham is Brougham's uncle and that Brougham had obtained the firearm that he used in the CNB robbery from Casey Brougham. A subsequent Augusta Police interview of Casey Brougham on October 20, 2022 revealed that Casey Brougham was missing a handgun at the time.

    c.   On October 3, 2022 at approximately 10:22 a.m., the subject phone number called the number associated with Cameron for approximately 1 minute.

    d.   On October 3, 2022 at approximately 10:53 a.m., the subject phone number called the number associated with Casey Brougham for approximately twenty six seconds.

    e.   On October 3, 2022 at approximately 10:54 a.m., the subject phone number called the number (240)-591-9030, which is associated with Anthony Carey[2]. This telephone number is a frequent contact of the subject phone number, second in frequency only to Brougham's girlfriend Cameron during the period that toll records were collected.

    f.   Notably, while active both just before and after the M&T Bank robbery on October 3, 2022, the subject phone number did not make or receive any calls between approximately 10:23 a.m. and 10:52 a.m., around the time of the M&T robbery occurred.

28.    Further, based on my training and experience, I know it is common for individuals to carry their cellular phones wherever they go. The above review of toll records supports that Brougham, in this instance, had his cellular phone with him during the period of time when the M&T Bank robbery occurred.

---

[2] Your affiant is aware that Carey has surfaced in another law enforcement encounter in Maine on about May 27, 2023, when he was temporarily detained during a traffic stop of a vehicle that he was a passenger in. During the traffic stop, the driver and another passenger were arrested and charged with possession of fentanyl and drug trafficking (among other charges). Over $4,000 was seized from the arrested passenger during this traffic stop.

29.     Verizon records showed the subject phone number was in use on or around October 15, 2022, the date of the bank robbery at CNB in Augusta, as follows:

   a.  Over the course of the afternoon and evening of October 14, 2022, the subject phone number received several calls from the number above associated with Cameron.

   b.  On October 15, 2022, at approximately 12:31 a.m. and again at 12:42 a.m., the subject phone number called the number above associated with Anthony Carey.

   c.  On October 15, 2022, the subject phone number did not send or receive any calls or text messages around the time of the CNB robbery.

   d.  Following the robbery on October 15, 2022, the subject phone number made a call at approximately 4:43 p.m. to (207) 656-2162, which is a number associated with an individual last known to be residing in the Gardiner, Maine, area, with a criminal record. At about 5:12 p.m., the subject phone number calls the number above associated with Anthony Carey.

   e.  Notably, following both bank robberies, one of the first calls made by the subject phone number was to Anthony Carey.

30.     Based on my training and experience, it is common that individuals who commit robberies may do so in a cluster in a similar geographic location. In this instance, given Brougham's stated propensity to commit a robbery to support his drug addiction, and due to his stated lack of money to cover household expenses at around the time of both bank robberies, I believe Brougham is an individual who would commit

12

multiple robberies for the same reasons.

31.     When Brougham was arrested by APD on October 19, 2022, law enforcement seized a black Motorola phone from him.  APD returned that Motorola phone, along with other personal property, to Brougham by providing it to the Kennebec County Correctional Facility on November 30, 2022.

32.     On August 30, 2023, Verizon produced records in response to a search warrant for certain information relating to the subject phone number, including cell site location information (CSLI) from October 2 and 3, 2023; the day before and of the M&T Bank robbery.

33.     Preliminary review of those Verizon records revealed that the subject phone number's CSLI activity was consistent with the phone's presence in the vicinity of Manchester, Maine[3] during the early morning hours of October 3, 2023 (the day of the M&T Bank robbery).  At approximately 10:17AM, the subject phone number's CSLI activity is consistent with travel south in the direction of the victim M&T Bank in Brunswick, Maine.  At approximately 10:53AM, the subject phone number's CSLI activity reflects the phone's travel beginning in the vicinity of Brunswick, Maine and returning in a northbound direction.  Later in the day of October 3, 2022, the subject phone number's CSLI activity reflects its presence in the vicinity of Gardiner, Maine[4].

34.     Records provided by Google in response to a subpoena show that the subject phone number is associated with a Google account bbrougham12@gmail.com.

---

[3] As previously noted in this affidavit, the residence of Casey Brougham was in Manchester, Maine.

[4] As noted previously in this affidavit, Brougham's residence was located in Gardiner, Maine around the time of the M&T robbery, though by the time of the Camden National Bank robbery (approximately twelve days later), he had relocated with Cameron to the residence of Casey Brougham in Manchester, Maine.

13

The records show that the bbrougham12@gmail.com account was associated with a Google Duo service[5] on about March 2, 2020.

35.     In response to a subsequent subpoena, Google provided records concerning the account bbrougham12@gmail.com, which informed that the account was created on about February 1, 2013.  The account's subscriber's name is presently Abigail Cameron and the Google Account ID is 497584974427.  The account was most recently updated September 18, 2023.  The account's recovery email account is jbchomeimprovement18@gmail.com; and the recovery SMS number is 207-530-7530 (the phone number previously described as being associated with Cameron).  The Google records show that the bbrougham12@gmail.com account uses the following Google services: Gmail, Android, Google Calendar, Google Hangouts, Location History, Google Payments, YouTube, Google Photos, Google Cloud Print, Google Chrome Sync, Google Maps, Google Play Music, Web & Activity, Google Play, Google My Maps, Google Drive, Google Keep, G1 Phone Backup, and Play Loyalty.  The account has "Google One Membership Information."  Additionally, Google produced records showing the account's IP activity from December 14, 2022 and through September 14, 2023.

36.     These Google records show that email address bbrougham12@gmail.com is also associated with the Google Payments Profile ID 8533-5257-0716, which was created March 7, 2013 and is presently in the name of Abigail Cameron.  This Payments Profile is associated with billing information of credit cards over the course of the history of the bbrougham12@gmail.com account (since 2013) in the names of Joshua

---

[5] Google Duo was a Voice Over IP (VOIP) and videotelephony service provided by Google, LLC, that has been "upgraded" to what is presently known as Google Meet.

Brougham, Abigail Cameron, Casey Brougham, B. Brougham[6], and Matthew Mason. Social media research has indicated that Joshua Brougham is the father or father figure of someone named B. Brougham. Notably, on about April 1, 2022, a Visa credit card number ending "0819" in the name of Joshua Brougham was added to this Payments Profile. On about August 21, 2022, a Visa credit card account ending "7814" in the name of Casey Brougham was added to the bbrougham12@gmail.com account. On about December 1, 2022, another Visa credit card account in the name of Casey Brougham, ending "3723" was added. In March 2023, a Visa credit card account ending "0444" in the name of Abigail Cameron was added; at the same time, Casey Brougham's the account ending "7814" was deleted from the Payments Profile.

37.     The records from Google relating to the above Google Payments Profile show that credit cards in the names of Brougham, Casey Brougham and Abigail Cameron were used during 2022 to pay for subscription streaming services as well as 100GB of Google One cloud storage.

38.     Accordingly, on October 2, 2023, I applied for and obtained a search warrant for information associated with the Google account bbrougham12@gmail.com. The same day, I served the search warrant upon Google. On about October 23, 2023, Google provided records responsive to the warrant, which I reviewed over the course of the following weeks.[7] Among these records, your affiant identified the following:

     a.  An Android Device Configuration Service Data record which identified

---

[6] B. Brougham is believed to be a minor and therefore out of abundance of caution, her full name is not listed here.

[7] Based upon my initial review of the records produced by Google, no location information was provided for after October 1, 2022, with respect to the bbrougham12@gmail.com account.

that a device having serial number cv7as:LGL22DL814ed2c7 was

associated with three users: bbrougham12@gmail.com,

jbrougham1085@gmail.com, and another Google email account in the

name of Brougham's minor daughter.  The record indicated that the device

Registration Time was February 13, 2022 5:47:29 PM UTC, and it's Time

of Last Data Connection was July 27, 2023, 1:32:35 AM UTC.

b. Another Device Configuration Service Data record which identified that a

device having serial a21:R9AR20W1CFJ was associated with two users:

bbrougham12@gmail.com and jbrougham1085@gmail.com.  The record

indicated that the device registration time was May 5, 2021, 1:14:03 AM

UTC, it's Time of Last Data Connection was September 11, 2023 7:36:23

PM UTC.

c. An email was sent by an individual having a Google account containing the

last name Brougham to both bbrougham12@gmail.com and

jbrougham1085@gmail.com in October 2022.

39.     On December 6, 2023, I submitted a preservation request to Google

concerning the accounts jbrougham1085@gmail.com and

jbchomeimprovement18@gmail.com.

40.     On December 11, 2023, I served a subpoena upon Google for information

pertaining to the Google accounts jbrougham1085@gmail.com and

jbchomeimprovement18@gmail.com.  The same day, Google provided records

responsive to that subpoena.  These records reflect that the subscriber name for the

Google account jbrougham1085@gmail.com is Joshua Brougham and the Google

Account ID is 34758780644.  The jbrougham1085@gmail.com Account's recovery SMS

16

number is +2075307530 (the phone number previously described as being associated

with Cameron).  The jbrougham1085@gmail.com account was created on March 31,

2020.  The account's most recent login was November 28, 2023.  The account utilizes

the following Google services: Gmail, Web & App Activity, Location History, Google

Calendar, Android, Google Hangouts, YouTube, Google Keep, and Google Chat.

41.     The records from Google reflect that the subscriber name for the account

jbchomeimprovement18@gmail.com is Josh Brougham and the Google Account ID is

588429657958.  The account's recovery SMS number is +2072135624 (the subject

phone number).  The account's "Last Updated Date" was November 19, 2023, though

the records do not indicate any recent logins or IP logs.  The account was created on

March 12, 2019.  The account utilizes the following services: Gmail, Web & App Activity,

Location History, Google Calendar, and Android.

42.     It is common for individuals using Google services to access and use

Google services on their mobile devices.

43.     Accordingly, there is probable cause to believe that Brougham committed

the bank robbery and theft at M&T Bank on October 3, 2022, in violation of 18 U.S.C. §

2113.   Further, records from Google demonstrate that Joshua Brougham is associated

with both Google accounts jbrougham1085@gmail.com and

jbchomeimprovement18@gmail.com.

44.     Based on the above, there is probable cause to believe that a search of the

information described in Attachment A will produce evidence of these crimes as further

described in Attachment B, including search history, correspondence, location

information, associates or co-conspirators, and payment transaction information

relevant to: Brougham's planning and involvement in the robbery, Brougham's timely

access to (or need of) money (or other currency or items of value), and precise account location information relating to the use of any Google services of the account around the day and time of the M&T Bank robbery by the Google Accounts jbchomeimprovement18@gmail.com and jbrougham1085@gmail.com.

## BACKGROUND CONCERNING GOOGLE[8]

45.     Google is a United States company that offers to the public through its Google Accounts a variety of online services, including email, cloud storage, digital payments, and productivity applications, which can be accessed through a web browser or mobile applications.  Google also offers to anyone, whether or not they have a Google Account, a free web browser called Google Chrome, a free search engine called Google Search, a free video streaming site called YouTube, a free mapping service called Google Maps, and a free traffic tracking service called Waze.  Many of these free services offer additional functionality if the user signs into their Google Account.

46.     In addition, Google offers an operating system ("OS") for mobile devices, including cellular phones, known as Android.  Google also sells devices, including laptops, mobile phones, tablets, smart speakers, security cameras, and wireless routers. Users of Android and Google devices are prompted to connect their device to a Google Account when they first turn on the device, and a Google Account is required for certain functionalities on these devices.

---

[8]     The information in this section is based on information published by Google on its public websites, including, but not limited to, the following webpages:  the "Google legal policy and products" page available to registered law enforcement at lers.google.com; product pages on support.google.com; or product pages on about.google.com.

18

47.     Signing up for a Google Account automatically generates an email address at the domain gmail.com.  That email address will be the log-in username for access to the Google Account.

48.     Google advertises its services as "One Account.  All of Google working for you."  Once logged into a Google Account, a user can connect to Google's full suite of services offered to the general public, described in further detail below.  In addition, Google keeps certain records indicating ownership and usage of the Google Account across services, described further after the description of services below.

49.     Google collects and retains data about the location at which Google Account services are accessed from any mobile device, as well as the periodic location of Android devices while they are in use.  This location data can derive from a range of sources, including GPS data, Wi-Fi access points, cell-site locations, geolocation of IP addresses, sensor data, user searches, and Bluetooth beacons within range of the device. According to Google, this location data may be associated with the Google Account signed-in or registered to the device when Location Services are activated on the device and the user has enabled certain global settings for their Google Account, such as Location History or Web & App Activity tracking.  The data retained may be both precision location data, like latitude and longitude coordinates derived from GPS, and inferential location data, such as the inference that a Google Account is in New York because it conducts a series of searches about places to eat in New York and directions from one New York location to another. Precision location data is typically stored by Google in an account's Location History and is assigned a latitude-longitude coordinate with a meter radius margin of error. Inferential data is stored with an account's Web & App Activity. Google maintains these records indefinitely for accounts created before

19

June 2020, unless the user deletes it or opts to automatically delete their Location

History and Web & App Activity after three or eighteen months. Accounts created after

June 2020 auto-delete Location History after eighteen months unless the user

affirmatively changes the retention setting to indefinite retention or auto-deletion at

three months.

50.     Google offers a map service called Google Maps which can be searched for

addresses or points of interest. Google Maps can provide users with turn-by-turn

directions from one location to another using a range of transportation options (driving,

biking, walking, etc.) and real-time traffic updates. Users can share their real-time

location with others through Google Maps by using the Location Sharing feature. And

users can find and plan an itinerary using Google Trips. A Google Account is not

required to use Google Maps, but if users log into their Google Account while using

Google Maps, they can save locations to their account, keep a history of their Google

Maps searches, and create personalized maps using Google My Maps. Google stores

Maps data indefinitely, unless the user deletes it.

51.     Google provides email services (called Gmail) to Google Accounts through

email addresses at gmail.com or enterprise email addresses hosted by Google. Gmail can

be accessed through a web browser or a mobile application. Additional email addresses

("recovery," "secondary," "forwarding," or "alternate" email addresses) can be associated

with the Google Account by the user. Google preserves emails associated with a Google

Account indefinitely, unless the user deletes them.

52.     Google provides an address book for Google Accounts through Google

Contacts. Google Contacts stores contacts the user affirmatively adds to the address

book, as well as contacts the user has interacted with in Google products. Google

Contacts can store up to 25,000 contacts. Users can send messages to more than one contact at a time by manually creating a group within Google Contacts or communicate with an email distribution list called a Google Group. Users have the option to sync their Android mobile phone or device address book with their account so it is stored in Google Contacts. Google preserves contacts indefinitely, unless the user deletes them. Contacts can be accessed from the same browser window as other Google products like Gmail and Calendar.

53.     Google provides an appointment book for Google Accounts through Google Calendar, which can be accessed through a browser or mobile application. Users can create events or RSVP to events created by others in Google Calendar. Google Calendar can be set to generate reminder emails or alarms about events or tasks, repeat events at specified intervals, track RSVPs, and auto-schedule appointments to complete periodic goals (like running three times a week). A single Google Account can set up multiple calendars. An entire calendar can be shared with other Google Accounts by the user or made public so anyone can access it. Users have the option to sync their mobile phone or device calendar so it is stored in Google Calendar. Google preserves appointments indefinitely, unless the user deletes them. Calendar can be accessed from the same browser window as other Google products like Gmail and Calendar.

54.     Google Drive is a cloud storage service automatically created for each Google Account. Users can store an unlimited number of documents created by Google productivity applications like Google Docs (Google's word processor), Google Sheets (Google's spreadsheet program), Google Forms (Google's web form service), and Google Slides, (Google's presentation program). Users can also upload files to Google Drive, including photos, videos, PDFs, and text documents, until they hit the storage limit.

Users can set up their personal computer or mobile phone to automatically back up files to their Google Drive Account. Each user gets 15 gigabytes of space for free on servers controlled by Google and may purchase more through a subscription plan called Google One.  In addition, Google Drive allows users to share their stored files and documents with up to 100 people and grant those with access the ability to edit or comment. Google maintains a record of who made changes when to documents edited in Google productivity applications. Documents shared with a user are saved in their Google Drive in a folder called "Shared with me."  Google preserves files stored in Google Drive indefinitely, unless the user deletes them.

55.     Google offers a free web browser service called Google Chrome which facilitates access to the Internet. Chrome retains a record of a user's browsing history and allows users to save favorite sites as bookmarks for easy access. If a user is logged into their Google Account on Chrome and has the appropriate settings enabled, their browsing history, bookmarks, and other browser settings may be saved to their Google Account in a record called My Activity.

56.     My Activity also collects and retains data about searches that users conduct within their own Google Account or using the Google Search service while logged into their Google Account, including voice queries made to the Google artificial intelligence-powered virtual assistant Google Assistant or commands made to Google Home products. Google also has the capacity to track the websites visited using its Google Chrome web browser service, applications used by Android users, ads clicked, and the use of Google applications by iPhone users. According to Google, this search, browsing, and application use history may be associated with a Google Account when the user is logged into their Google Account on the browser or device and certain global

settings are enabled, such as Web & App Activity. Google Assistant and Google Home voice queries and commands may also be associated with the account if certain global settings are enabled, such as Voice & Audio Activity tracking. Google maintains these records indefinitely for accounts created before June 2020, unless the user deletes them or opts in to automatic deletion of their location history every three or eighteen months. Accounts created after June 2020 auto-delete Web & App Activity after eighteen months unless the user affirmatively changes the retention setting to indefinite retention or auto-deletion at three months.

57.     Google integrates its various services to make it easier for Google Accounts to access the full Google suite of services. For example, users accessing their Google Account through their browser can toggle between Google Services via a toolbar displayed on the top of most Google service pages, including Gmail and Drive.  Google Hangout, Meet, and Chat conversations pop up within the same browser window as Gmail.  Attachments in Gmail are displayed with a button that allows the user to save the attachment directly to Google Drive.  If someone shares a document with a Google Account user in Google Docs, the contact information for that individual will be saved in the user's Google Contacts.  Google Voice voicemail transcripts and missed call notifications can be sent to a user's Gmail account.  And if a user logs into their Google Account on the Chrome browser, their subsequent Chrome browser and Google Search activity is associated with that Google Account, depending on user settings.

58.     When individuals register with Google for a Google Account, Google asks users to provide certain personal identifying information, including the user's full name, telephone number, birthday, and gender.  If a user is paying for services, the user must also provide a physical address and means and source of payment.

59.    Google typically retains and can provide certain transactional information about the creation and use of each account on its system.  Google captures the date on which the account was created, the length of service, log-in times and durations, the types of services utilized by the Google Account, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via Google's website or using a mobile application), details about the devices used to access the account, and other log files that reflect usage of the account.  In addition, Google keeps records of the Internet Protocol ("IP") addresses used to register the account and accept Google's terms of service, as well as the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the Google Account.

60.    Google maintains the communications, files, and associated records for each service used by a Google Account on servers under its control.  Even after a user deletes a communication or file from their Google Account, it may continue to be available on Google's servers for a certain period of time.

61.    In my training and experience, evidence of who was using a Google account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

62.    Based on my training and experience, messages, emails, voicemails, videos, documents, and internet searches are often created and used in furtherance of

24

criminal activity, including to communicate, facilitate, or reference the offenses under investigation. Thus, stored communications and files connected to a Google Account may provide direct or circumstantial evidence of the offenses under investigation.

63.    In addition, the user's account activity, logs, stored electronic communications, and other data retained by Google can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information and the data associated with the foregoing, such as geo-location, date and time, may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

64.    Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.,* information indicating a plan to commit a crime), or consciousness of guilt (*e.g.,* deleting account information in an effort to conceal evidence from law enforcement).

65.    Other information connected to the use of a Google account may lead to the discovery of additional evidence. For example, the apps downloaded from the Google Play store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators.

25

66.     Therefore, Google's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Google services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users, account location information, search history, and content of correspondence related to or referencing the subject offense.

## CONCLUSION

67.     Based on the forgoing, I request that the Court issue the proposed search warrant.

68.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Google. Because the warrant will be served on Google, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

Kevin McCusker
Special Agent
Federal Bureau of Investigation

Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedure

Date: Jan 03 2024

City and state: Bangor, ME

John C Nivison U.S. Magistrate Judge
Judge's signature
Printed name and title

26